















JRM   4/16/03   15:04

3:03-CV-00747   SEC V. GLESS

*1*

*CMP.*

ORIGINAL

FILED

03 APR 16 AM 9: 44

CLERK. U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

Debra M. Patalkis (Lead Counsel)
Lawrence A. West
Daniel H. Rubenstein
Neil J. Welch, Jr.
Nancy E. McGinley
Cory C. Kirchert
John J. Field III
Securities and Exchange Commission
450 Fifth Street, NW
Washington, D.C. 20549-0911
(202) 942-7133

Nicolas Morgan (Local Counsel) CA Bar No. 166441
Securities and Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA 90036-3648
(323) 965-3880

Attorneys for Plaintiff
Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 03 CV **03 CV 0747 W** LAB |
| Plaintiff, | **COMPLAINT** |
| v. | |
| MATTHEW C. GLESS, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission alleges:

### SUMMARY

1.  This case involves a massive financial fraud at Peregrine Systems, Inc., a publicly traded San Diego-based software company. Defendant Matthew C. Gless, who held various senior finance positions including Chief Financial Officer, engaged in a financial fraud scheme with other senior officers of the company to inflate Peregrine's stock price. During the fraud,

Peregrine filed materially incorrect financial statements with the Commission for 11 consecutive quarters between April 1, 1999, and December 31, 2001. The fraud was uncovered in April 2002, and in February 2003, Peregrine restated its financial results for its fiscal years 2000 and 2001, and for the first three quarters of fiscal 2002. Peregrine reduced previously reported revenue of $1.34 billion by $509 million, of which at least $259 million was reversed for non-substantiated transactions.

2.      The heart of the fraud was the recording of hundreds of millions of dollars of revenue despite non-binding arrangements with customers, in violation of Generally Accepted Accounting Principles ("GAAP"). Gless and other Peregrine senior officers engaged in deceptive practices to artificially inflate Peregrine's revenue. Among other things, Gless knew that senior Peregrine officers were secretly adding material sale contingencies—by oral or written side agreement—to what appeared on their face to be binding contracts.

3.      Gless then took fraudulent action to conceal the revenue fraud. When Peregrine booked the non-binding contracts, and the customers predictably did not pay, the receivables ballooned on Peregrine's balance sheet. To make it appear that Peregrine was collecting its receivables more quickly than it actually was, Gless entered into financing arrangements with banks to exchange receivables for cash. He improperly accounted for the bank transactions as sales of the receivables and removed them from the company's balance sheet. There were several problems with this. First, because Peregrine had given the banks recourse, and frequently paid or repurchased unpaid receivables from them, Peregrine should have accounted for the bank transactions as loans and left the receivables on its balance sheet. Second, Gless knew that some of the "sold" receivables were not valid because the customers were not obligated to pay Peregrine. Third, as Gless knew, several of the "sold" invoices were fake. One

of the fake invoices purported to reflect a $19.58 million sale.  Gless also concealed the revenue fraud and resulting collection problem by improperly writing off unpaid receivables.

4.      While Gless was aware of the ongoing fraud, he sold 68,625 Peregrine shares for proceeds of approximately $4 million.

5.      By engaging in the acts alleged in this complaint, Gless violated, or aided and abetted Peregrine's violations of, the antifraud, books and records, internal accounting controls, and reporting provisions of the federal securities laws, and unless enjoined by this Court, will continue to do so.

## THE DEFENDANT

6.      Gless was employed at Peregrine from April 1996 until the Board of Directors forced him to resign on May 5, 2002.  Peregrine hired Gless in April 1996 as its Controller.  In October 1998, he was promoted to Chief Accounting Officer, and in November 2000 he became the company's Chief Financial Officer and a Director on the Board.  In May 2001, Peregrine gave Gless the additional title Executive Vice President.  Gless resides in Encinitas, California.

## THE ISSUER

7.      Peregrine, a Delaware corporation with principal offices in San Diego, California, sells infrastructure management software.  Its fiscal year ends March 31.  From its initial public offering in April 1997 to the present, Peregrine's common stock has been registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78l(g)].  It traded on the Nasdaq National Market System from its initial public offering until August 30, 2002, when it was delisted.  On September 22, 2002, Peregrine filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

COMPLAINT - 3

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

9.      Venue properly lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Gless inhabits and transacts business in this judicial district, because offers and sales of the securities at issue in this case took place in this judicial district, and because certain of the acts and transactions constituting the violations in this case occurred within this judicial district.

10.     Gless made use of the means and instrumentalities of interstate commerce in connection with the acts alleged in this complaint.

11.     The Commission requests that the Court permanently enjoin Gless from engaging in further violations; order an accounting; impose civil penalties upon him for participating in the accounting fraud; order him to pay disgorgement, plus prejudgment interest, and civil penalties for insider trading; order him to disgorge any other ill-gotten gains, plus prejudgment interest; and bar him from acting as an officer or director of any reporting company.

## THE REVENUE INFLATION SCHEME

12.     Following its initial public offering in April 1997, Peregrine reported 17 consecutive quarters of revenue growth through the quarter ended June 30, 2001.  During this period, Peregrine's publicly reported financial results met or exceeded analysts' expectations, and the company's stock price increased from $2.25 per share (split-adjusted) to as high as $79.50 per share on March 27, 2000.

13.     Beginning in or about the quarter ended June 30, 1999, to meet or exceed

quarterly revenue forecasts, senior Peregrine officers purported to sell Peregrine's software to resellers known as channel partners.  However, the channel partners' obligations to Peregrine frequently were subject to contingencies or other terms that made revenue recognition improper. In many cases, both senior Peregrine personnel and channel partners knew, through secret oral or written side agreements, that:  (1) the channel partners were not obligated to pay Peregrine, but that Peregrine would later negotiate sales to end users and arrange for the payment to "flow through" them; (2) the channel partners had 30 days or more to back out of the software license contracts; or (3) if the channel partners were unable to resell Peregrine's software licenses, they could invoice Peregrine for "services" in a dollar amount equal to what they had not resold.  By October 1999 at the latest, Gless was aware that Peregrine personnel were engaging in these practices.  Gless schemed with other senior Peregrine officers, at the ends of Peregrine's fiscal quarters, about ways to arrange non-binding transactions with channel partners and record them as revenue, so that Peregrine could meet or exceed quarterly revenue projections.

14.     These arrangements did not qualify for revenue recognition, because GAAP (in particular, American Institute of Certified Public Accountants' ("AICPA") Statement of Position ("SOP") 97-2) required that Peregrine satisfy the following four criteria prior to recognizing revenue on the sale of its software:  (a) persuasive evidence of an arrangement exists, (b) delivery has occurred, (c) the vendor's fee is fixed or determinable, and (d) collectibility is probable.

15.     Senior Peregrine officers, with Gless's knowledge and participation, used other gimmickry to inflate the company's revenue.  To convince certain customers to purchase Peregrine's software, Peregrine entered into reciprocal agreements with them, including nonmonetary transactions, sometimes referred to as barters or swaps.  Under certain

circumstances it is appropriate to recognize revenue on nonmonetary transactions.   However, Peregrine recognized revenue on transactions that did not satisfy the applicable revenue recognition rules, either because (a) Peregrine did not intend to use the product it purchased, (b) Peregrine was merely exchanging software inventory for resale, or (c) there was no vendor-specific objective evidence ("VSOE") to support valuation.  Gless understood the revenue recognition rules that applied to nonmonetary transactions, and he knew, or was reckless in not knowing, that these rules prohibited revenue recognition on many transactions for which Peregrine recorded revenue.

16.     In other reciprocal transactions, Peregrine essentially paid for its customers' software purchases.  Peregrine management, with Gless's knowledge and acquiescence, invested stock or cash in customers.  Contemporaneously, the customers agreed to purchase Peregrine software.  Peregrine's investments in its customers enabled them to pay Peregrine for the "receivables."  The net effect was a "round trip" of cash or stock from Peregrine to the customer, then cash (or proceeds from selling Peregrine stock) back to Peregrine to pay for purported receivables.  Gless knew, or was reckless in not knowing, that Peregrine's investments in certain customers were not economically justified, but instead were a ploy to allow Peregrine to record revenue without placing the customers at financial risk.

17.     Gless and other members of senior management routinely allowed Peregrine's financial books to remain open after fiscal quarters had ended, and caused Peregrine improperly to record as revenue, for the prior quarter, software transactions that were not consummated until after quarter end.  On one or more occasions, senior management characterized these transactions—in their communications with each other—as having been completed on "the 37th

of December." In some cases, transactions did not close for months after Peregrine had recorded revenue for them.

## GLESS COVERED UP THE SCHEME

18.     As a result of the revenue inflation scheme, Peregrine accumulated millions of dollars of aging receivables, some of which were bogus, on its balance sheet. Large aged accounts receivable were not being paid and, as a result, days sales outstanding ("DSO") and other important indicators of Peregrine's financial health were deteriorating.

19.     DSO is the average number of days it takes a company to collect its accounts receivable. It is an analytical tool used by financial analysts and investors to track the age of a company's aggregate accounts receivable and to assess the quality of a company's receivables and, ultimately, its revenue. The formula for calculating DSO is accounts receivable divided by sales times days in the quarterly or annual period.

20.     Gless directed Peregrine's senior treasury manager to remove receivables from Peregrine's balance sheet by selling them to banks at quarter end. Each quarter, the senior treasury manager calculated the dollar amount of receivables she needed to sell to manage the DSO number down to the target range Gless had set for her. After the senior treasury manager sold the receivables for cash, Peregrine removed them from its balance sheet. This practice reduced Peregrine's DSO to the level Gless prescribed.

21.     Financing receivables, in itself, is not illegal. However, Gless and others at Peregrine abused the receivable financing process to conceal the revenue recognition scheme. By 1999, Peregrine had agreed with the banks that Peregrine would collect the receivables from its customers, and then pay the banks. Peregrine also gave the banks recourse on the receivables. As a result, when Peregrine's customers did not pay Peregrine, Peregrine often paid the banks

itself (without informing them that Peregrine, rather than Peregrine's customer, had paid), or

repurchased the uncollected receivables.  Gless knew, or was reckless in not knowing, that some

of the purported receivables Peregrine sold to banks should never have been recorded as revenue,

that the banks had recourse on the receivables, and that Peregrine sometimes repurchased

receivables from the banks.

22.     The receivables Peregrine "sold" to banks did not qualify for off–balance-sheet

treatment under the applicable accounting rules.  Peregrine corrected this error in its February

2003 restatement and added a loan balance of $141.6 million to its March 31, 2002 balance

sheet.  In connection with its restatement, Peregrine explained the error as follows:  "Peregrine

sold, or factored, receivables to multiple financial institutions over the past three years.

Peregrine recorded these factoring transactions as true sales of receivables recording the cash

received and removing the related receivables from the balance sheet, as if the risk of collection

loss had passed to the buyer without recourse.  However, based on the terms of the factoring

agreements and based on past servicing practices of the Company, these accounts receivable

factoring arrangements should have been recorded as loans instead of sales of receivables."

Gless knew, or was reckless in not knowing, that—because the risk of collection loss had not

passed from Peregrine to the banks—Peregrine should never have removed the receivables from

its balance sheet.

23.     Although required by applicable accounting rules, Peregrine did not properly

disclose this off-balance-sheet financing in its financial statements.    For example, in the last

Form 10-Q Peregrine filed before the fraud was uncovered, it made the following minimal, but

false, disclosure about its receivable financing:  "The Company may at times market certain

client receivable balances <u>without recourse</u>." (Emphasis supplied.)   Gless signed this Form 10-Q.

## GLESS CAUSED THE SALE OF FALSE INVOICES TO BANKS

24.     To increase Peregrine's cash balance and lower its DSO, Gless caused his senior treasury manager to sell false invoices to banks.  As the June 30, 1999 quarter came to a close, Peregrine had sold all available receivables but still needed to reduce DSO to make the target Gless set to avoid alerting investors to Peregrine's poor collections.  Gless, the senior treasury manager, and certain other Peregrine personnel agreed to prepare invoices for several million dollars in transactions that had not closed, and sell them to a bank.  The senior treasury manager then sold the bank the "receivables" that the invoices supposedly represented.  However, not all of the contracts closed, leaving Peregrine with a shortfall of several million dollars.

25.     In June 2001, the senior treasury manager informed Gless that Peregrine would miss the target DSO number because its receivables were approximately $20 million too high. With Gless's approval and encouragement, the senior treasury manager created a false $19.58 million invoice and sold it to a bank.  Gless signed and submitted to the bank a Form of Sale and Assignment in which he falsely represented that the invoice reflected a valid receivable.  By selling false receivables to banks, Gless and other Peregrine personnel caused Peregrine's financial books and records to overstate Peregrine's cash flow from operations, and understate its accounts receivable and its liability to the banks.

## GLESS CAUSED IMPROPER ACCOUNTING FOR CASH COLLECTIONS

26.     Peregrine, with Gless's knowledge and approval, further falsified its balance sheet and DSO by improperly accounting for cash collected from customers.  Peregrine and the banks buying its receivables agreed that even after Peregrine sold the banks the receivables, Peregrine

would collect the receivables and then remit payment to the banks within a certain time period. Thus there was generally a permissible lag time between the date Peregrine collected cash and the date Peregrine had to remit payment to the banks. Peregrine's practice was to reduce accounts receivable when Peregrine sold a receivable to a bank. Then, if and when Peregrine collected the receivable, the senior treasury manager would reduce the accounts receivable again by the amount of the collection. When this practice resulted in Peregrine's holding money at quarter end, Gless's subordinate—the senior treasury manager—called it the "double dip," because Peregrine had already taken the receivable off its books. In addition, Peregrine would fail to increase accounts payable to reflect its liability to the bank, and would record the cash as its own, instead of holding it in trust as required by the banks.

27.     When the double dip occurred, Peregrine's reported receivables and DSO were artificially reduced, cash was overstated, and liabilities were artificially decreased. In the following quarter, when Peregrine remitted the cash to the banks, Peregrine would reverse the double dip entries. Peregrine double dipped almost every quarter, beginning in September 1999. One of the most egregious examples of the quarter-end double dip occurred in the third quarter of 2002. On December 11, 2001, a Peregrine customer made an early payment of $13.8 million on a receivable that Peregrine had sold to a bank. The payment was not actually due from the customer until February 12, 2002. Although Peregrine's contract with the bank required Peregrine to remit customer payments within two weeks and to hold them in trust, Peregrine did neither. As a result, Gless knew, or was reckless in not knowing, that Peregrine's reported accounts receivable at quarter end were understated by $13.8 million, as was its liability to the bank.

## GLESS IMPROPERLY WROTE OFF RECEIVABLES

28.     As the dollar amount of uncollectible receivables increased in the first quarter of fiscal 2001 (the quarter ended June 30, 2000), Gless, with the assistance of others, improperly wrote off receivables that he knew, or was reckless in not knowing, should not have been recorded as revenue in the first place. Although Gless knew these write-offs had nothing to do with acquisitions, to conceal them from investors, he improperly recorded them as "Acquisition Costs & Other Expense," in Peregrine's income statement. Peregrine's write-offs of uncollectible "receivables" to acquisition-related accounts further misled investors because Peregrine did not include these write-offs in its disclosed pro forma operating results. The write-offs appeared on Peregrine's income statement as one-time charges rather than expenses from operations. During the first three quarters of fiscal 2001, Gless buried approximately $12 million in uncollectible receivables in this way.

29.     In the last quarter of fiscal 2001 (the quarter ended March 31, 2001), Gless, with the assistance of others, exploited Peregrine's acquisition of the company Extricity to conceal uncollectible receivables from public view. That quarter Gless improperly wrote off $30 million in receivables to the "Acquisition Costs & Other Expense" line item of Peregrine's income statement. Gless knew, or was reckless in not knowing, that (a) a substantial portion of these receivables should not have been recorded as revenue in the first place, (b) the receivables were not impaired as a result of the Extricity acquisition, and therefore (c) it was inappropriate to make it appear to the investing public that the write-off related to a non-recurring event.

30.     In the quarter ended September 2001, Gless, with the assistance of others, took advantage of Peregrine's acquisition of Remedy Corporation to write off $26.65 million to the "Acquisition Cost & Other Expense" line item, and $16.93 million to a balance sheet item called

1   "Remedy Acquisition Accrual."  Gless knew, or was reckless in not knowing, that (a) a

2   substantial portion of these receivables should not have been recorded as revenue in the first

3   place, and (b) the receivables were not impaired as a result of the Remedy acquisition, and

4   therefore (c) it was inappropriate to make it appear to the investing public that the write-off

5   related to a non-recurring event.

## GLESS SIGNED FALSE SEC FILINGS AND
## FALSE MANAGEMENT REPRESENTATION LETTERS

9       31.     Between August 1999 and February 2002, Gless signed nine quarterly reports on

10  Form 10-Q, and two annual reports on Form 10-K, that Peregrine filed with the SEC.  These

11  periodic reports falsely represented that Peregrine's financial statements were prepared in

12  conformity with GAAP.  With slight variations, the reports described Peregrine's revenue

13  recognition practice as follows:  "Revenues from license agreements are recognized currently,

14  provided that all of the following conditions are met:  a noncancelable license agreement has

15  been signed, the product has been delivered, there are no material uncertainties regarding

16  customer acceptance, collection of the resulting receivable is deemed probable and the risk of

17  concession is deemed remote, and no other significant vendor obligations exist."  Peregrine's

18  Form 10-Q for the period ended December 31, 1999 changed "[r]evenues from license

19  agreements" to "[r]evenues from direct and indirect license agreements."  Its Forms 10-Q for the

20  periods ended June 30, 2001, September 30, 2001, and December 30, 2001, included the

21  following additional disclosure:  "We may grant extended payment terms of more than one year.

22  Typically this is only done in limited circumstances where the contract is with customers having

23  a proven credit history; when appropriate we discount the related receivable at the applicable

24  market interest rate as a reduction of revenue."  These periodic filings incorporated Peregrine's

25  materially false financial statements.  By at least October 1999, when Gless signed Peregrine's

periodic SEC filings, he knew, or was reckless in not knowing, that Peregrine's financial statements were materially false and misleading.

32.     With knowledge of the fraudulent accounting scheme, Gless signed other Peregrine filings, including securities registration statements.  When Gless signed these filings, he knew, or was reckless in not knowing, that Peregrine's financial statements—incorporated in the filings—were materially false and misleading.

33.     Gless made other false public statements that he knew, or was reckless in not knowing, would mislead investors.  For example, in an investor conference call on July 24, 2001, Gless fraudulently lauded Peregrine's financial results for the quarter ended June 30, 2001: "This impressive feat of managing growth in a predictable fashion marks yet another quarter of meeting or beating street expectations, now seventeen in a row since becoming a public company."

34.     Gless also signed more than nine management representation letters that Peregrine presented to its independent auditors.  Most of these letters contained the following false representations, among others:  (a) that Peregrine's financial statements were in accordance with GAAP, (b) that there were no material transactions that were not properly recorded in Peregrine's accounting records underlying its financial statements, and (c) that there had been no (i) fraud involving management or employees who had significant roles in internal control, or (ii) fraud involving others that could have a material effect on the financial statements.  When Gless signed management representation letters to Peregrine's independent auditors, he knew, or was reckless in not knowing, that they were false.

**GLESS RESPONDED FALSELY TO AN SEC COMMENT LETTER**

35.     In early 2001, the SEC's Division of Corporation Finance reviewed Peregrine's Form 10-K for the fiscal year ended March 30, 2000, and its Forms 10-Q for the first three quarters of fiscal year 2001.  After reviewing these four periodic reports, the Division of Corporation Finance issued a Comment Letter to Peregrine on March 28, 2001.  Among other questions, the SEC asked whether Peregrine had a history of offering concessions to its customers.  The Comment Letter also asked Peregrine to "[c]larify how 'concession risk' impacts your revenue recognition and how that policy complies with SOP [AICPA Statement of Position] 97-2."

36.     Gless knew, when he received the Comment Letter, that Peregrine routinely offered concessions to its customers, and routinely engaged in an array of revenue recognition practices that did not comply with SOP 97-2.  However, in Gless's April 12, 2001 response, he falsely claimed, among other things, that (a) Peregrine "does not have a history of offering concessions for any customers, products, or payment arrangements," (b) Peregrine has an excellent collection history on extended payment term contracts without concession, (c) payment is never contingent on resale of the product, (d) Peregrine does not have any significant obligation for future performance to bring about the resale of the product by the buyer [and] all sales are final and non-cancelable, and that (e) "in the very rare instances where a 30-day money back guarantee is offered in software sales, the company defers the revenue on these contracts until such time as this 30-day time frame has elapsed."  Gless knew, or was reckless in not knowing, that each of these statements was false when he submitted his response to the SEC.

## GLESS PROFITED FROM THE FRAUD

37.     Between July 26, 1999, and February 25, 2000, Gless sold 68,625 shares of Peregrine common stock for proceeds of approximately $4 million, at prices ranging between $30 and $92 per share.  On May 6, 2002, after Peregrine announced that certain transactions involving revenue recognition irregularities, totaling as much as $100 million, had been called into question, the stock closed at $0.89.  Peregrine declared bankruptcy on September 22, 2002, and its stock now trades in the Pink Sheets for less than $1 per share.

38.     From 1999 through 2002, Peregrine paid Gless a base annual salary.  The company also paid Gless bonuses totaling approximately $348,550, and awarded him incentive stock options.

### FIRST CLAIM

**Gless Violated Exchange Act Section 10(b) and Exchange Act Rule 10b-5
[Financial Fraud]**

39.     Paragraphs 1 through 38 are realleged and incorporated herein by reference.

40.     Gless knowingly or recklessly made misrepresentations and omissions of fact with the intent of materially misstating Peregrine's publicly reported financial results.

41.     By reason of the foregoing, Gless violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5[1]].

//

---

[1]  2002 ed., p. 60, promulgated 12/22/48, as amended 8/11/51.

## SECOND CLAIM

### Gless Violated Securities Act Section 17(a), Exchange Act Section 10(b) and Exchange Act Rule 10b-5 [Insider Trading]

42.     Paragraphs 1 through 38 are realleged and incorporated herein by reference.

43.     Gless sold Peregrine stock on the basis of material nonpublic information concerning Peregrine's true financial condition, in breach of his fiduciary duty to Peregrine and its shareholders.

44.     By reason of the foregoing, Gless violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM

### Gless Violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1 and Aided and Abetted Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [Books and Records and Internal Controls Violations]

45.     Paragraphs 1 through 38 are realleged and incorporated herein by reference.

46.     Gless deliberately circumvented existing internal accounting controls in order to falsify Peregrine's books and records.

47.     Gless, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Exchange Act Section 13(b)(2) [15 U.S.C. § 78m(b)(2)].

48.     Gless knowingly and substantially participated in a scheme to cause extensive false and misleading entries in Peregrine's books and records.  By doing so, Gless aided and abetted Peregrine's failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

49.     Gless knowingly and substantially contributed to Peregrine's failure to maintain its internal accounting controls.  By doing so, Gless aided and abetted the company's failure to

devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

50.     By reason of the foregoing, Gless violated Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1[2]] and aided and abetted violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## FOURTH CLAIM

**Gless Aided and Abetted Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, and 13a-13 thereunder**
**[Reporting Violations]**

51.     Paragraphs 1 through 38 are realleged and incorporated herein by reference.

52.     Gless knowingly and substantially participated in Peregrine's inclusion of financial statements that were not presented in conformity with GAAP in its annual, quarter, and other reports filed with the Commission from the first quarter of fiscal year 2000 (the period ended June 30, 1999) through the third quarter of fiscal year 2002 (the period ended December 31, 2001).

53.     By reason of the foregoing, Gless aided and abetted violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20[3], 240.13a-1[4], and 240.13a-13[5]].

---

[2]  2002 ed., p. 133, promulgated 2/23/79.
[3]  2002 ed., p. 112, promulgated 2/13/65.
[4]  2002 ed., p. 128, promulgated 7/24/97.
[5]  2002 ed., p. 132, promulgated 5/12/77, as amended 5/3/83, 7/9/85, 3/13/89, 3/27/92, and 6/14/96.

COMPLAINT - 17

1

## FIFTH CLAIM

2

### Gless's Violations of Exchange Act Rule 13b2-2
### [Misleading the Auditors]

3

4      54.     Paragraphs 1 through 38 are realleged and incorporated herein by reference.

5      55.     Gless made materially false statements to accountants in connection with their

6    audits and quarterly reviews of Peregrine's financial statements.

7      56.     By reason of the foregoing, Gless violated Exchange Act Rule 13b2-2 [17 C.F.R.

8    § 240.13b2-2].[6]

9

10

## RELIEF REQUESTED

11      WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that

12    this Court:

13

## I.

14

15      Issue an order of permanent injunction restraining and enjoining Gless, and his agents,

16    servants, employees, attorneys, and assigns, and those persons in active concert or participation

17    with him, and each of them, from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)],

18    Exchange Act Sections 10(b) and 13(b)(5) [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange

19    Act Rules 10b-5 [17 C.F.R. § 240.10b-5], 13b2-1 [17 C.F.R. § 240.13b2-1], and 13b2-2 [17

20    C.F.R. § 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A),

21    and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act

22    Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], and 13a-13 [17 C.F.R.

23    § 240.13a-13].

24

25

26

27

28

---

[6]   2002 ed., p. 133, promulgated 2/23/79.

## II.

Order an accounting by Gless of all money, property, and other assets directly or indirectly derived from the transactions alleged herein.

## III.

Issue an order directing Gless to disgorge, with prejudgment interest, all ill-gotten gains resulting from his conduct described in this complaint.

## IV.

Issue an order directing Gless to pay civil monetary penalties under Exchange Act Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1].

## V.

Enter an order under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Gless from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

//

1

2

## VI.

3

Grant such other and further relief as this Court may deem just and proper.

4

5

Dated: April __, 2003

6

Debra M. Patalkis (Lead Counsel)

7

Lawrence A. West

Daniel H. Rubenstein

8

Neil J. Welch, Jr.

Nancy E. McGinley

9

Cory C. Kirchert

John J. Field III

10

Attorneys for Plaintiff

11

Securities and Exchange Commission

450 Fifth Street, N.W.

12

Washington, DC 20549-0911

Telephone: (202) 942-7133  (Patalkis)

13

Facsimile:  (202) 942-9581

14

Local Counsel:

15

16

Nicolas Morgan

Securities and Exchange Commission

17

5670 Wilshire Boulevard, 11th Floor

Los Angeles, CA 90036-3648

18

Telephone: (323) 965-3877

Facsimile: (323) 965-3908

19

20

21

22

23

24

25

26

27

28

COMPLAINT - 20

ORIGINAL

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

FILED

sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

03 APR 16 AM 9:56

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: DEPUTY

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Matthew C. Gless |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) San Diego County<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Debra Patalkis<br>Securities and Exchange Commission<br>450 Fifth Street, NW<br>Washington, DC 20549-0911<br>(202) 942-7133 | ATTORNEYS (IF KNOWN)<br>Michael F. Perlis<br>Stroock & Stroock & Lavan LLP<br>2029 Century Park East, Suite 1800<br>Los Angeles, CA 90067-3086<br>(310) 556-5821 |

'03 CV 0747 W LAB

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- ☒ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT (For Diversity Cases Only)**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

See attachment

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment &Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153Recovery of Overpayment of Veterans Benefits
- ☐ 160 Stockholders Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Tort to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury-Medical Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prisoner Conditions

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reappointment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities Exchange
- ☐ 875 Customer Challenge 12 USC
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State
- ☐ 890 Other Statutory Actions

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 DEMAND $ Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE Hon. Jeffrey T. Miller Docket Number 02 CV 2310JM(LSP) 02 CR 3104-W

DATE April 16, 2003 SIGNATURE OF ATTORNEY OF RECORD
Debra Patalkis and
Nicolas Morgan

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

Pd $150.00 4/16/03 #93099 VB Refund

<u>Insert to IV</u>

This is a securities enforcement action alleging (a) financial fraud under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (b) insider trading under 15 U.S.C. § 78(b), 17 C.F.R. § 240.10b-5 and 15 U.S.C. § 77q(a); (c) aiding and abetting books and records, internal controls and reporting violations under 15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13, and 15 U.S.C. § 78m(b)(2)(A) and § 78m(b)(2)B, and 15 U.S.C § 78(b)f; and (d) misleading an issuer's auditors under 17 C.R.F. § 240.13b2-2.